Case No. 19-1011 Music Choice Appellant v. Copyright Loyalty Board at Elm Mr. Faulkner for the Appellant, Ms. Utrecht for the Amelies, and Mr. Hellman for the Intervenor Good morning, Your Honors. May it please the Court, my name is Paul Faulkner. I'm counsel for Music Choice. I'd like to reserve three minutes for rebuttal, please. I'd like to focus on the two threshold errors that Music Choice identified in its briefing related to the Copyright Loyalty Board's ruling that Music Choice's internet transmissions to the extent they are received by subscribers outside of their homes are entirely excluded from the scope of the pre-existing subscription service license. The first of those threshold errors was the Board taking up the issue at all in the first place. At no time during the proceeding did SoundExchange ask for a ruling that these internet transmissions were outside the scope of the license. To the contrary, SoundExchange expressly disclaimed any ruling on that point. What they were arguing was that the judges should set a separate rate for the- The statute simply says if the issue is presented. That doesn't mean it's necessarily presented by a party. It could be presented by the judges thinking that was an interior legal issue. And they are not a federal court, so they're not limited to the practices of a federal court. Your Honor, there is- I'm sorry. They're an agency. Yes, Your Honor, but there is precedent directly on this point. And the same situation- Directly? Yes, on the point that you just raised. In the webcasting 4 proceeding, what we had at the end of the proceeding after the close of the record, the judges felt that there was evidence in the record that had been submitted for a different reason. That's an evidentiary question, not a legal argument. Your Honor, the register specifically interpreted the presented language that Your Honor just reflected the referral in that case is because that theory had not been presented by the parties during the course of the proceeding. But it was an evidentiary theory, wasn't it? No, Your Honor. I'm sorry for my- My recollection of both those cases you cited were evidence cases. Your Honor, we cited three cases. There were the two cases of this court, intercollegiate broadcasting and sudden demotion of claimants. And those two cases were both evidentiary cases but also arbitrary and capricious for ruling based on these theories that were not presented by the parties. But in the webcasting 4 proceeding, the register, this was in the context of construing the statute, the referral statute itself, which contains that presented by the parties language that Your Honor was just referring. And the register construed that language quite specifically, now cited IBS, intercollegiate and sudden devotional claimants, but also said very specifically that it cannot be considered presented by the parties if it was not understood during the proceeding to be the subject of litigation if it was not presented by the parties. Wait a minute. You said it couldn't- Yes. Couldn't be considered presented by the parties. Right. Did the register say it couldn't be presented other than by the parties? The register focused on the parties. Now- That's my point. Yep. Did the register- Yes. I give up. I can't. It's all right. No worries. The register was very specific about this and focused on the problem of, the problem that this presents when the judges are the ones who come up. Now, there are ways, Your Honor, I would agree with you if the concern is, are the judges in all instances completely bound by the scope of what the parties put in an argument in the proceeding? There are circumstances, and even in settling devotional claimants, this Court noted that the judges have various ways to, if early enough in the proceeding- Let me take a step back. One of the charming features of these proceedings is that the parties' cases get presented on paper months before the hearing starts in separate rounds, a direct case or a bubble case. The hearings go on typically five weeks. There are multiple opportunities where the Court, if they identify a threshold issue that the parties have not raised, for them to request that the parties address those issues. And, in fact, it is a very active bench, I can tell you, having done several of these proceedings. If you read the transcript in the Estor's proceeding, you will see a good percentage of the time at the hearing is devoted to the judges' questions. This is not a case that presents that issue, but I would agree with you, Your Honor, in a case like that, if the judges raise the issue and the parties have the opportunity to develop a factual record on that point, then it would be appropriate. And I think it's really- Well, suppose it's only a legal question. Well, even if it's a- Well, this was a mixed, certainly a mixed question of determining whether they're all- That's a separate argument. Right. Well, let's assume it's strictly a legal question. Well, the question in Webcasting 4 was whether the judges had the authority to set a different type of structure for the rate for webcasters. That was a legal question. That was a purely legal question that was referred to the register, and the register rejected it. I don't know the details of that one, actually, but the register- It sounds like the register decided whatever the register decided there, but here the register decided to entertain the question. Well, just because the register erred this time doesn't mean we can't review that error. But it's not precedent. I mean, you said you classified it as precedent, and I'm not understanding why it's precedent. I'm sorry. I mean, it's preceding. It's an occurrence that happened before, but why is it binding anybody? Well, because it was a legal ruling by the register construing the statute which has to do with the scope not only of referrals to the register, but which is intertwined with the notion of what the judges can consider when they are then doing their final determination. And notably, it's important- You're not talking about our cases. You're talking about a case that the register decided. I'm talking about a similar copper Ehrlich Board case- No, no, you're not talking about the two cases that you cited in your brief. Correct. They were our cases. Correct, Your Honor. I read his evidentiary questions. I respectfully disagree with you, Your Honor, but I understand Your Honor's point. This is a separate ruling which we also briefed in both our opening briefs- So your argument is it's arbitrary and capricious for the register. Has that switched her position as to whether presented mean had to be presented by the parties? Yes, and even if it hadn't been there, it was certainly also arbitrary and capricious for the judges to take the issue up even after the referral. In the Webcasting IV proceeding, after the register ruled in this fashion,  they reiterated that they thought that there was evidence in the record that had been submitted by the parties for a very different purpose that they thought could have supported this ruling that they wanted to make, but they noted then, in light of the register's ruling, that the interpretation of that evidence, out of context and without adequate input of the parties, would be capricious. Moreover, reopening the proceeding at this juncture long after the closing of the record would be improper. So that was in Webcasting IV, 81 Federal Register, 23-619. So even the judges in that proceeding understood the register to be limiting in that sense, and they acknowledged it would be arbitrary and capricious to go searching through the record that had been established without reference to this new argument and try to map that evidence onto this new argument without giving the parties the opportunity to introduce additional evidence and at least contextualize that evidence. And that's exactly what the judges did here. They did the opposite of what they recognized would be capricious. Counsel, let me ask a question that goes to your more fundamental argument. Suppose the register in this case had held that I interpret the word service to refer to exclude mobile apps, not Internet outside the homes, but mobile apps, acknowledging that there was Internet outside the homes through computers, but there was no mobile apps back in 1998. And so I interpret service as not including mobile apps. Would you have the same argument? Would that be an acceptable argument? I absolutely wouldn't. Why? Well, you would have to look at how the register set up the test, okay? The statute, you know, obviously that is not the case that we have. No, but I'm asking hypothetically. Yes. You know, you never answer a hypothetical question by saying that's not this case. Once when Judge Scalia was sitting here and a lawyer said that, he threw the briefs at him. Well, I hope Your Honor won't do the same. I'll try. I promise I won't. I promise I won't. I apologize, Your Honor. The reason that it would be just as bad, because the register correctly in setting out this test, said if we're going to come up with a new legal test to determine the scope of the pre-existing service license, let's look at the statute, always a good first step, and let's look at these grandfather provisions, okay? And this is what the register did. And in particular, look at the distinction between Section 114 D2B versus D2C. These are two sets of rules, programming rules, for a licensee that takes advantage of Section 114. This is one of the key grandfather provisions for pre-existing services. And the statute itself … … had ambiguity to it. Now, let's just deal with my hypothetical. Yes. Suppose the copyright, the registrar, had simply held that service did not include, the 1998 service did not include mobile apps. Hadn't said internet outside the home, but just mobile apps. Well, there'd be no basis in the statute for coming up with an arbitrary distinction like that. Why? Well, because … There was no mobile apps back in 1998. Right, but the register ruled in this very proceeding that the key distinction is whether it is what the register considered an existing service offering or an expanded service offering. The register would have had to have started, at least started in the same way of saying, Your Honor, respectfully, I believe what the register was doing was coming up with a legal test to resolve the ambiguity Your Honor is talking about. How do we determine what service means? This is how the register chose to do it. And I think the register would have had to have chosen to do it. It was an absolutely reasonable way to do it, which is to say, look at these, look at the actual statute. How does it distinguish between, the register started by creating … that the internet in the home, the internet outside the home did exist in 1998. Right. There's an argument on the legislative history on that, I agree with that. Let's assume you're right about that. The mobile apps didn't exist in 1998. So if the register had interpreted service to exclude that … But the register acknowledged that existing service offerings … No, I'm giving you a hypothetical. Your Honor, it would have been error. Why? Because there would be no basis from within the statute. The statute, the register interpreted that part of the statute as saying in an existing service offering, you're allowed to adapt and change. For example, the register gave the example of cable. That just because cable was … the technology behind cable transmissions at the time, in 1998, were a certain way, they've changed since then. Yeah, but that's just a matter of degree. I'm not understanding your answer to the hypothetical, because if the register said a mobile app is just a different animal, it's a different animal because you can access it outside the home in a way that you just can't without the app. So it's a different product, basically. What's wrong with that? To use the word I use in that opinion, it's a different product. It is … I apologize for going back to what's actually in the register's decision, but that is what's on appeal here. The register set up this … said that you have to look, if you're talking about an existing service offering in a transmission medium used in 1998, that can adapt fairly broadly to new technologies in new ways. And that's the distinction. The problem is that by excluding all internet transmissions, by the way, which is what the register ruled, all internet transmissions are outside the scope of the existing service offering. That was where the … I'm assuming you're right about that argument. I'm asking you the next question. You seem to me you're ducking the answer. I'm not trying to, Your Honor. The register specifically said, if I'm right and internet transmissions … No, I'm talking about if the register had said something else. There would be no basis in the statute for allowing … Why couldn't the register have concluded, just as the new chief judge asked, that the mobile app was a different offering? In our prior opinion, we said service included both the entity and the offering. Yes, Your Honor. Why couldn't the register have concluded that a mobile app was a different offering? Well, first of all, because the register would have to be making that distinction as a matter of law that just without any fact findings, okay, about what the characteristics were of … You know, even the register said you have to … No, no, everybody agrees that there was no mobile app in 1998. Right, but the register also noted there were new forms of cable transmission that weren't around in 1998 that were allowed to be … that still didn't take you outside of being an existing service offering. And a mobile app would be just the same as internet outside the home. Is it your view that a mobile app and the internet are the same type of service? No, no, but what the register held is when the statute uses medium of transmission, it's in a very broad sense. It's that cable isn't limited to just what cable was in 1998. Internet was … The register said it isn't just a specific type of internet transmission. It's understood to be something broader, just using the internet. And that's the level at which the statute speaks in making these different categories. Can I ask you a question about what's practically at stake here? Yes. So is it true that going forward after this cycle, 2018 to 2022, that the PSS, the pre-existing, the grandfathering idea is just off the table now? That is not correct, Your Honor. What has changed is the rate standard, and it's actually going to carry through the next proceeding we're going to skip, and then whatever the five years after that, I apologize, math is not my strong suit right now, but we're going to skip a proceeding, and then starting with the next proceeding, the rate standard is going to change, but … That's all I'm talking about is the rates. But pre-existing subscription services category will remain. It's still going to have grandfathered programming rules like I was talking about before, and it's still going to have a separate proceeding. It's going to be in a different time than the non-pre-existing cable and satellite television services. But what we're talking about in this case is rates, and with respect to rates … Actually not, Your Honor. The board ruled that these transmissions are excluded entirely from all of the grandfather provisions, including the regulatory, the rules for the programming and everything else. It's actually broader, the ruling in this case, than just the rate standard. I thought there was a distinction between existing and expanded. Right, and the only thing that the board decided, because the register had said as a measure of law, can't be existing. So the only question and the only reason we have a six-factor test is to then determine between the next two categories. And the board held that to the extent these Internet transmissions are received inside the home, and by the way, that would apply to apps used inside the home as well, they're within the statute, but they declined to set a separate rate for them. But to the extent they're received outside the home, they're completely outside. For both the rate standard and the programming rules and anything else. I assume we're out of time. Thank you. Thank you, counsel. We'll give you some time for rebuttal. Good morning, Your Honor. Jennifer Utrecht on behalf of the government. Your Honor, when Congress enacted the Digital Millennium Copyright Act in 1998, it did so against an administrative backdrop that everyone very well understood what the three existing services were that were grandfathered. And as this court noted in Muzak, the statute describes it in an extremely ambiguous way because the term service is used both to refer to business entities and it's used to refer to services. But the historical context of this is very clear. There were three services. There was Muzak, DMX, and DISH. And I'm sorry, Muzak, Muzak Choice, and DMX. And Muzak Choice offered a cable and satellite subscription service. There was no Internet subscription service. It was a cable and satellite subscription service. And I'd like to, I think, address the two threshold errors that opposing counsel has identified here. Now I'm confused. I thought it was indisputable that Muzak Choice had offered Internet service in 1998. So I think it should be, I want to be very clear and precise with this answer. I think that Muzak, we are not disputing for the purpose of this litigation, that Muzak Choice as a business may have made Internet transmissions. But that does not mean that any, its Internet transmissions were part of the grandfathered pre-existing subscription service. The pre-existing subscription service that was grandfathered through the DMCA was Muzak Choice's cable and satellite service, which its business model was extensively described. How do you get that out of the statute? So I think there are a couple of things in the statute that are worth pointing out. So the first is pre-existing subscription service is defined in section 114J11, and it says it has to be a service, a subscription service in particular. And it is very obvious from the, either the way that we have talked about the service now, that Muzak Choice's service was its cable and satellite service. I think the second aspect of this is that the DMCA was enacted against this administrative backdrop, and we can presume that Congress is legislating against this proceeding that had ended immediately before. You interpret the service as precluding, the word precluded, Internet offering? So the existing service, I think, the way the register talks. Well, no, no, wait a minute. Yes. I'm asking about whether the word service precluded an offering of Internet. No, Your Honor, but I do think that the, as this. So if Muzak Choice was offering an Internet service outside the home, but not a mobile app, wasn't that included within the term service? So I think there are two responses to that. The answer is no, and I think there are two reasons why that's true. The first is, as this Court recognized in Muzak, the term service is ambiguous, and we have to understand it with respect to context, including legislative history, but also including the context of the statute. The second reason why, at least in this respect, the existing service, the thing that Congress was trying to grandfather, which may expand in ways, including to the Internet in certain limited respects, but the very core of the service does not include the Internet, as evidenced by 114D2. Congress drew a very clear distinction between the conditions that should apply to the services as they existed when they are transmitting in the same medium, cable and satellite, versus when they're transmitting in a new medium. And on C, which is the new medium, lays out a number of new conditions that have to apply. I don't dispute, though, that Muzak Choice was transmitting over the Internet. Again, Muzak Choice's business, the entity, the business entity, may have been making Internet transmissions, but that does not mean that that's part of the core service that was grandfathered in the Act. Well, based on what textual argument, though? The argument is about intent, history, and background. What about the words of the statute? As I was explaining, 114D2C laid out a number of new conditions that were supposed to apply when you expanded to a new medium. Well, that's the whole question, is this a new medium? Well, many of these conditions were designed with respect to the Internet, and you can see that. So there are conditions that prevent or that require services to not interfere with digital rights management software, to not allow their consumers to scan and copy music. These are conditions that Congress designed in order to prevent Internet users from engaging in copyright infringement through using these subscription services. It's very odd. But can you clarify, why would that mean that some Internet services were not grandfathered into the statute? You know, the fact that new services may have special provisions for Internet services doesn't necessarily mean that Internet services were not grandfathered in. Well, so it's because a preexisting, if you look at D2B versus D2C, a preexisting subscription service that's operating, it says, in the same medium, has these historical conditions. But if they expand into a new medium, they have to comply with all of these additional conditions. What's the new medium here? The new medium would be the Internet here. The new medium is... Well, why is it the new if it was in existence in 98? The Internet was in existence. No, no, no, it was being provided by Music Choice. So Music Choice, the business, may have been providing the Internet. Why wasn't it? According to the copyright, excuse me, the register, it would be Bucket 2, right? But still, Bucket 2 was covered by the grandfather clause. Expanded service. The expanded service, right. So, and this is, I think, the distinction that I'm identifying. The existing service did not include the Internet. If it expanded into the Internet... Well, I don't understand. I'm still having problems. Why isn't it included back in 98 if they were providing it? Not only Internet service, but providing it outside the home. So, I think that the... I'm not sure... I know there's legislative history which indicated at one point Congress is referring to both just satellite and cable. Right. But the statute... But it's not simply... The statute is... Right. And I think this is why I'm trying to explain this distinction between D2 and D3. Where's the ambiguity in the statute that you're relying on? The ambiguity in the statute is the definition of service, right? The pre-existing subscription service definition in J11, as this court identified in MUSAC, is ambiguous. But it's also... I mean, we're not breaking new ground here. Everyone has recognized up until this point, including this court, that there are only three existing services. And the statute doesn't identify three services, but that is something that this court and the register have long understood to be true. Under your analysis of the statute, which you think excludes the Internet altogether, do you think that... From pre-existing services. From the core existing services. But the existing service could expand into the Internet. That's obvious from the register's decision as well as from the legislative history. But do you think it would have... The register didn't have freedom to say that what you're calling the core existing service, which is not a statutory term, but that the core existing services you're conceiving of actually included Internet transmission because, as a factual matter, Internet transmission was going on in 1998. Do you think that register would have been precluded by the statute from reaching that conclusion? I think that the register recognized, as this court has, that the term, as it's defined, is ambiguous. But I also think that the register identified a number of contextual clues as well as, within the statute, including the distinction between D2B and D2C, because, as the register explained, it would be very strange for Congress to have sub salientio, grandfathered-in Internet transmissions, to always have every Internet transmission, because it's the same medium, to always fall within the D2B conditions. But it would only be the Internet transmissions by a provider who was broadcasting through the Internet before, during the relevant time period. It wouldn't be all new Internet services. It would be existing Internet services. Why would that be so strange? So I think the answer to that question is, again, Congress was legislating against this administrative backdrop in which a royalty proceeding had just concluded before this statute. That royalty proceeding involved only three services. It extensively defined what those three services did and who they were and what broadcasts and transmissions they were making. You mean three entities or three services? Three entities. Three entities. You don't mean three services. Well, the three entities were offering three different services. Right. But those services were limited to cable and satellite. Correct. Your argument based on the preceding administrative resolution that informed Congress's consideration, I thought, was that when you look at what was going on with that, that was only cable and satellite. It may be true as a factual matter that Music Choice was transmitting via Internet, but there's no reason to think that the administrative proceeding took account of Internet transmissions at all. It was tethered solely to cable and satellite transmission. That's correct. And that is why it may be true that Music Choice as a business was making Internet transmissions, but its service, its subscription service, the way it talked about it, the way the copyright owners talked about it during the arbitration proceeding, was a cable and satellite service. And so when Congress wrote the DE2 conditions, the distinction between the same medium and a different medium, it was ensuring that if any of these three services were to expand beyond those transmission mediums that were identified as their core existing service. So, for example, one of these services only transmitted in satellite. If they were to expand into either cable or Internet, that would be subject to the new conditions. But there's nothing in the statute that indicates a level of degree, right? So Music Choice was broadcasting over the Internet. Maybe its Internet offerings were small, but nothing in the statute suggests that it matters how much they were doing before the relevant date of grandfathering. So nothing in particular about the definition of J-11 mentions degree. That's true. But, again, we're not breaking new ground. Everyone has understood this term to be extremely limited to these three, both as the court recognized in MUSE Act, these three businesses and the three program offerings that they were making at that time. And the reason that we have limited it in this way is because those were the three businesses who participated in the arbitration proceeding. So we have one of those three businesses here. And we have one of the services that they were providing at the time. We have their cable and satellite subscription service, which was what was happening at the time. But that was not, you know, it doesn't, it was neither Internet nor was it a mobile application, which was an entirely, as this Court's questions have recognized, an entirely separate problem, which is that the mobile application does not resemble at all anything like even what they allege they were doing in 1998. What is the difference, the actual practical difference between the Internet transmission and cable and satellite transmission? If all, you acknowledge that all three of them were going on, or at least you haven't disputed that all three of them were going on. We have not disputed that there were, that MUSIC Choice was making Internet transmissions, but we do dispute that it was part of the court subscription service. Right, but if it was making Internet transmissions, it was making Internet transmissions of something, right? And what is the difference about the something that was being transmitted over the Internet as opposed to the something that was being transmitted over cable or satellite? I mean, I think, I think the, as a, just a fundamental matter, no one was subscribing to a separate Internet service. No one was subscribing to, I want to have MUSIC Choice's Internet transmissions. They were subscribing to having MUSIC Choice's cable and satellite channels. And then, and along with that apparently came Internet transmission. Maybe people didn't care about that, but it's just, it seems like it's... Somebody had to care about it, otherwise they wouldn't have had it, they wouldn't have offered it. Why wasn't this an offering? It's hard for me to answer these questions because my, the extent of my knowledge about what MUSIC Choice was doing in 1998 is limited by stray statements that it made, that it was happening before. There's no discussion of what... But those are in the record, and those haven't been disputed. Right, and so I, what I can say is that the reason this grandfather provision was created was to protect the three businesses and the three services who had received a lower rate in the copyright arbitration royalty panel to allow them to continue those operations undisrupted by changes in the digital licensing scheme. And when, to include other transmissions in a different medium that was not discussed and were not subject to that royalty rate making would defeat the entire purpose. Even in the legislative history, Congress did contemplate the Internet service. So that's, well, but notably, Your Honor, in the legislative history, Congress said that a pre-existing service could expand into the Internet. Which illustrates, again, that Congress was contemplating... That would be bucket two, though. Correct. MUSIC Choice would still win if they're in bucket two, right? Well, that's... Right, so... Isn't that correct? That is the answer to my question. Right, so the discussion... They would still win if they're in bucket two. If they're in bucket two, they would be subject to the lower rates for their Internet transmissions that are available for them. I don't know why you're answering that question. Yes, and so I wanted to be very clear that, up until this point, we had been talking about bucket one. But, yes, if we would like to move to bucket two, which I'm happy to answer questions about, the discussion with respect to bucket two is, has MUSIC Choice made its core cable and satellite service available, that same service available on the Internet? And if so, then it would fall into bucket two. But it's very obvious from the facts that have been presented, both during the hearing and in the rehearing that was sent to the judges, that MUSIC Choice has offered a different service. There was... They now have a mobile application where their Internet transmissions... Yeah, but that's not... If this case had involved only the distinction of mobile application, it would be a different case, wouldn't it? If there were all different facts, it would be a different case, yes. No, no, no, no, no, no. If the registrar's opinion had said that mobile applications is a different service... So what the registrar... Because it was clear it was not in existence in 1998. Right. Well, what the registrar... We'd have, it seems to me, a much easier case. What the registrar said was that there are always going to be a number of different factors, because this is a fact... Trying to figure out whether something is the same service is a fact-intensive inquiry. And you can expand even within the same transmission medium and still be a different service. I mean, that's MUSAC, right? MUSAC had expanded within satellite and still fell outside the preexisting subscription service. And so the registrar did not make any findings one way or the other about whether there were mobile applications in 1998 or the degree to which things were available outside the home. The registrar just said, this is something that, when you're considering this question, is a worthy factor. And, in fact, when it was sent to the judges, the judges reasonably concluded that this mobile application was not available until after the enactment of the statute. It has greatly increased the amount of availability of Internet portably in mobile applications on tablets. And this has taken MUSAC's choice of service, and it's a different program offering. It is not the same program offering as its residential cable and satellite service. Can I just ask you one question about remedy here? Yes. If we were to vacate the registrar's legal interpretation of the same transmission medium, then could we sever parts of the order that were based on that legal determination? I mean, I think if you believed the registrar's legal interpretation were incorrect because the statute is unambiguous, then the appropriate remedy, I think, would be to remand to the copyright royalty judges to reconsider their factual analysis in light of the appropriate standard of law. Are you suggesting severance would be inappropriate? I'm not sure what would be severed because the judges made their determination based on the referral from the registrar and said this is the test that we think that we need to apply here. And so if there were a new test, I think it is properly left to the agency to resolve the question in light of the new test. I have a strange question. How many lawyers work for the registrar of copyright? I do not know the answer to that question. I wish I did. I'm very sorry. I've interacted with maybe a handful, less than a handful. Can I ask you the practical question I asked earlier about the rates, the relevance of the preexisting rate going forward, given the new legislation? So there will no longer be a lower rate for any preexisting subscription services. I believe what opposing counsel said was that they would like to continue to use the preexisting, the lower conditions, the historical pre-Internet, early 1990s conditions for all of its transmissions. And I think this really underscores why we should not, the statute should not be interpreted to include within the core existing service, the Internet, because it would mean the fact that a company that may have had a subscription service made Internet transmissions before 1998, that they could continue to evade the conditions that Congress had clearly set forward in order to ensure that subscription Internet transmissions complied and did not infringe various protections of copyright. If this expires in 2022, there's lower rates. Lower rates. Right. The rates are expiring. The conditions themselves, the things that transmissions by subscription services have to do. So the difference between historically what had to happen was you just had to ensure that you complied with the sound performance compliment, which was don't play the same song a certain number of times, and you couldn't have an archive. Sorry, you couldn't pre-establish what songs you were going to be playing that day. But the new conditions, which everyone else has to comply with, and which the pre-existing subscription service is supposed to comply with if they expand into the Internet, include things like do not evade digital rights management, do not allow people to scan music when you're playing it. There are like seven more conditions that are supposed to happen. And I think Music Choice's position is that it should not have to do that for any of its Internet transmissions, even though Congress clearly intended for the pre-existing subscription services that expanded into any new medium, including the Internet, to comply with these conditions. So the conditions continue. And the way you read it is the additional conditions continue to exist going forward, but there's no possibility of getting the lower rate any longer going forward. That's done with. Correct. Correct. When Congress passed the Music Modernization Act, it recognized that whatever investments it had protected that had occurred prior to 1998, the continuing to allow these businesses who had made these early investments to benefit from the lower rate was no longer appropriate. How much money is at stake? That is a question that's better served to either SoundExchange or to Music Choice.  Thank you. Good morning, Your Honors. Matthew Hellman for SoundExchange. May it please the Court. This Court has already held that the term service is ambiguous in the MUSAC decision. And in addition in that decision, it also held that the term should be construed narrowly in light of the grandfathering provision. It was ambiguous with respect to the issue presented. That's correct. That doesn't necessarily mean it's ambiguous in this case, does it? I suppose not as a theoretical matter, but it certainly is. And if I could, I would. Then you should explain why. I will explain why. To determine whether something is ambiguous or not, it's a pretty straightforward test. We look to text, we look to structure, and we look to background. The structure in this case, as we've already discussed, is one in which Congress imposed additional conditions for Internet transmissions or transmissions that would be over the Internet. Those conditions do not apply to a true preexisting service in its original form. That at least creates ambiguity. And then when you look to the legislative issue... Wait a minute, I don't understand that. Please. Say that again. Certainly. If you look at how Congress divvied up the different obligations among the different services, the bucket one service, as you're referring to it, is exempt from certain requirements that are imposed on services that transmit over the Internet. And by that I mean archiving and the other things that my colleague was talking about. Those conditions are designed to constrain Internet service. What my friend on the other side is saying is that when Congress did that, they nevertheless wanted this supposed preexisting Internet service to be free of that. I think, frankly, that removes any ambiguity. At a minimum, it means that the statute is ambiguous. And if we look at the legislative history, there is no doubt Congress said as clear as a bell that the preexisting services that it was talking about, the bucket one services, were satellite and cable services. And not only that, it defined them in contradistinction to Internet services. In the MUSE Act case, there was something of a dispute between the majority opinion and the concurring opinion. I found that paragraph in the legislative history itself terribly ambiguous. That's right. And as Your Honor pointed out, in that case, perhaps it was ambiguous, the particular point that was at dispute there. No, I'm talking about in this case. Oh, in this case. Yes. The paragraph in which Congress referred to the Internet is quite ambiguous as to whether it's referring to it as an expanding service or an existing service. You know, this is at page 89 of the conference report. What we're talking about here is that Congress intended to limit, to grandfather the existing services in the same transmission medium and to any new services in the new transmission medium where only transmissions similar to the existing service were provided. That second half of what they're talking about, which is where the Internet might come in, is a bucket two kind of question. My friends, the primary submission they've made today, and I heard them arguing, is that they're a bucket one service. And that cannot be reconciled. Because of these other conditions. Because of these other conditions, because of the legislative history, and because of the… Did the register refer to these other conditions at all? Yes, it did, Your Honor. I can give you the exact site, but yes, they did. But so how is it so clear from the statutory text, right? You're talking about a conference report. You're talking about what they intended. But what about the text of the statute? So the text… So we're talking about the word service. What I have here today is to convince you that there's some ambiguity there. It doesn't necessarily have to be completely foreclosed on. The conditions are in the text, aren't they? The conditions are in the text. That's exactly right. The conditions are in the text. And the background, of course, against which Congress legislated was well-established. And there is this Court's holding in Muzak. Do you agree that Music Choice made Internet transmissions before the statute? As the case comes to this Court, they have the declaration of their CEO saying that he did. That's the record before this Court. If that were further developed, I suspect that it would prove not to be the case. But as it comes to the Court, that is the state. But what the Registrar also noted in the Registrar's opinion is that the grandfathering clause in light of this Court's decision in Muzak was intended to be narrow…it should be narrowly construed only to protect pre-existing investments. What the Registrar pointed out was whatever this Internet service was, assuming that it existed at all, it was so inconsequential that the CARP, the arbitration panel, did not make note of it. The librarian did not make note of it. Congress did not make note of it. And so if we're talking about grandfathering to protect existing investments, that's yet another reason why, as a matter of law in determining what a service is, it is reasonable to say it does not include and encompass an inconsequential service. Well, if it was in Bucket 2, then Congress did contemplate. So let's talk about Bucket 2. I don't dispute the general proposition that Bucket 2 services are entitled to the more favorable rate standard. But whether something is Bucket 2 or not comes down to whether it is similar enough to what was before. The way you define similar enough, under the Registrar's opinion, are six non-binding, but I think quite sensible, drawn from the legislative text, legislative history, factors in terms of does it substitute, does it provide greater functionality, and those types of considerations. At that level, the question for this Court is, did the judges, the CRB, abuse their discretion, their substantial discretion in these kinds of cases, in concluding that internet transmissions outside the home are different in kind, sufficiently different, to not be a Bucket 2, but rather a Bucket 3 service. If we conclude it's Bucket 1, then you lose, right? If you were to conclude it's Bucket 1, then there would have to be a remand, yes. But it's not a Bucket 1 service because the text of the statute, the structure, as Chief Judge Srinivasan pointed out, is inconsistent with treating internet transmissions that way. The legislative history not only affirmatively defines services to be cable satellite, but expressly distinguishes them from later, competitive, burgeoning internet services. And that makes perfect sense, because there was no substantial or consequential internet service on the horizon. How do we know that? We know that because the CARB, when it was talking about it, did not talk about pre-existing services that way, or the services that were before it that way. We know that's the case because when the librarian reviewed it, did not disturb the definition of those services as cable satellite, said that they're really facing competition from the internet, and the conference report is exactly the same way. This is really an easier case, I think, than the MUSAC case, because whatever ambiguity was floating around there, all signs point in the same direction here, that those internet services are not Bucket 1. They could be Bucket 2, but the Royalty Board here has confirmed that they're not. Do you think that they can't be Bucket 1? By the way, Buckets, I'm assuming that your Bucket 1 is existing, Bucket 2 is expanded. Is that right? Yes, Your Honor. Okay. So by saying that they're not in the category of existing, are you saying that the register couldn't conclude that any internet transmission is within existing, even though Music Choice was making internet transmissions in 1998? We think, in light of the Court's MUSAC decision and the rule of construction that's stated there, if the statute is clear, it favors us. At best, or at worst, I suppose, it's ambiguous, in which case you would defer to the register's conclusion, as well as the legislative history. But do you think it's so clear that the register couldn't make that, couldn't conclude that internet transmissions were part of the things that were being offered in 1998, and therefore some internet transmissions are within existing? What we argued to the register when the case went up was that the statute, yes. The answer to your question is yes. Our primary submission to the register, although we don't need to go this far to win the case, is that existing does not include internet. If there's ambiguity, then we do everything that we were just talking about here. And your theory of why existing does not include internet as a matter of law is what? Text structure and history. The text, if you look at what Congress was doing when it was dividing up how it was going to, the requirements it was going to impose on existing services versus the requirements it was going to impose on buckets two and going forward services. Bucket one is exempt from the internet-related restrictions. Bucket two has them in spades. And what particular provision are you talking about? So that's what I'm confused about. What are you talking about? I think the clearest one is C3, which deals with archived programs. And what it says is if you want to get the favorable treatment as a bucket two provider, you cannot make archived programs available to the user, which is a concept that works very well on the internet. Anyone can go on the internet and listen to five symphonies in a row or five pop songs in a row. It has no bearing for cable and satellite transmissions. There's also technical provisions that are a little harder to explain, but if the court goes through the other provisions in C, you find that there are rights management provisions that are, again, only make sense in the context of an internet service, don't make any sense in the context of a satellite service. And what do you say about the point that was raised earlier by Judge Rao, that even if all that is true about internet services, it doesn't necessarily have to do with an internet service that's provided by one of the three preexisting entities, as opposed to an internet service provided by somebody else? It's a fair point, but I think it puts us in the world of, well, what did Congress really mean then? And there, with that ambiguity, you go to the legislative history and the administrative backdrop, all of which not only, as I repeat myself, not only affirmatively define these services to be cable-satellite, but expressly say this is not the internet. The internet is going to be a different set of considerations in the bucket two in the expanded set of services. Okay. If the court has no further... I see I'm past my time, so thank the court for its time. Thank you, counsel. We'll give you three minutes, Roberto. Thank you, Your Honor. So the statute does not expressly describe these as cable and satellite services. The legislative history mentions cable and satellite, it mentions the three companies and services. What about his structural argument? Other provisions of the statute apply only to cable and television and do not apply to the internet. But they don't. This was exactly my point. If you look at the actual statute, if you look at the actual statute, the way you determine which apply is the statutory language in the transmission medium used by the service in 1998. Here's the reason why. Music Choice was transmitting over the internet for a couple of years prior to 1998. All during that time, the only restrictions in the statutory license were the restrictions that Music Choice currently has, these D2B restrictions, right? What are they? The truth is, they're technical restrictions, but they do involve, you have to satisfy the sound recording performance complement, there are certain things, they can't play too many songs by the same artist in a row, and so there are various technical features that they have to comply with with the programming. But the point is, those were already applicable. There was no separate category for internet prior to 1998, and so Congress decided for the services, whatever they were doing at that time, that's how we're going to determine which set of restrictions move forward. So there's nothing in that structure that would cause you to move away from the language of the statute that tells you exactly how you're supposed to determine that, and it's a factual issue. And I think the legislative history, it's important to remember, there were no fact findings associated with that legislative history. There were no hearings about which transmission media the services were using. Music Choice was never asked. Music Choice was never even involved in the lobbying for that legislation. So there were no fact findings behind that. It was just a list. And as far as the MUSAC case is concerned, that presented entirely different issues than this case. The question of transmission medium was not in the case. The statutory language that's important here, the D2B language, transmission medium used by such service, was not in that case. That was about the only other preexisting service entity who, through a series of intercorporate transactions, acquired a whole separate service. No, you're absolutely right. That's a different case. And as far as this idea of core services, you know, there's no such distinction in the statute or even in the legislative history. Well, arguably there is. And the paragraph dealing with the prospect of an Internet service, it's not at all clear whether Congress was referring to that as, what we're talking about as bucket one or bucket two. I agree with Your Honor that the legislative history is far from clear, which is yet another reason that it certainly shouldn't be used to change the text of the statute. Thank you, Your Honors. Justice Scalia once referred, ironically, to using ambiguous legislative history to reverse the normal notion. If the statute is ambiguous and the legislative history is ambiguous, there should be even more deference. Was that before or after he threw the briefs, Your Honor? Thank you, Your Honor. Thank you, counsel. Thank you, counsel. The case is submitted. The court will take a short recess before reconvening for the third case.
judges: Srinivasan, Rao, Silberman